UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MIRAMAX FILM CORP.,

                                       Plaintiff,

    - against -

GRANADA FILM f/k/a GRANADA FILMS LIMITED;
LONDON WEEKEND TELEVISION PRODUCTIONS
LIMTED; LONDON WEEKEND TELEVISION
LIMITED; and ITV PRODUCTIONS LIMITED,

                                        Defendants.

------------------------------------------------------------X

ECF CASE

cv

COMPLAINT

MIRAMAX FILM CORP., by its undersigned attorneys, Schwartz & Thomashower LLP, for its Complaint, alleges as follows:

### NATURE OF THE ACTION

1.     This is an action for breach of contract and unjust enrichment. Plaintiff Miramax Film Corp. ("Miramax") contracted with defendants Granada Films Limited and London Weekend Television Productions Limited for, among other things, the right to finance and co-produce with defendants and then itself distribute worldwide a full length motion picture entitled "Northanger Abbey" based on the original novel written by Jane Austen. In accordance with its obligations under the parties' agreement and as consideration for defendants' agreements as set forth therein, Miramax spent over $600,000 in development costs with respect to the Picture  After Miramax declined to exercise its

1

option to finance, co-produce with defendants, and distribute the Picture, defendants were obligated by the parties' contract, among other things, to repay Miramax for its $600,000 in development costs and to provide certain other rights to Miramax with respect to the Picture. Upon information and belief, defendants produced, released and distributed the Picture worldwide, including in the United States, beginning in or about March, 2007. However, notwithstanding the terms of the parties' agreement, defendants have failed to, among other things, repay Miramax its over $600,000 in actual out-of-pocket development costs, plus interest as agreed, in connection with the Picture, despite due and repeated demand.

## PARTIES AND JURISDICTION

2. Plaintiff Miramax Film Corp. is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 161 Avenue of the Americas, New York, New York 10013.

3. At all relevant times herein, defendant Granada Films Limited n/k/a Granada Film ("Granada") was and is, upon information and belief, a registered company organized and existing under the laws of the United Kingdom, with its principal place of business located at The London Television Centre, Upper Ground, London, England.

4. At all relevant times, herein, defendant London Weekend Television Productions Limited ("LWT") was and is, upon information and belief, a registered company, organized and existing under the laws of the United Kingdom, with its principal place of business located at The London Television Centre, Upper Ground, London, England.

5. Upon information and belief, defendant London Weekend Television Limited ("London Weekend") is a registered company organized and existing under the laws of the United Kingdom, with its principal place of business located at The London Television Centre, Upper Ground, London, England, and is, upon information and belief, the alter ego and/or successor in interest to all of LWT's right, duties, obligations and liabilities, or otherwise liable for the claims asserted herein, in that, among other things, London Weekend and LWT held themselves out as interchangeable entities throughout the parties' relationship, including on numerous pieces of correspondence relating to the parties' contract and the Picture.

6. Upon information and belief, defendant ITV Productions, LTD ("ITV") is a registered company organized and existing under the laws of the United Kingdom, with its principal place of business located The London Television Centre, Upper Ground, London, England, and is, upon information and belief, the alter ego of, and/or the successor in interest to all of the rights, duties, obligations and liabilities of Granada, LWT, and/or London Weekend, or is otherwise liable for the claims asserted herein, in that, among other things, ITV held itself out as having assumed the rights, duties, obligations and liabilities with respect to the contract at issue in numerous pieces of correspondence relating to the parties' contract and the Picture.

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. Plaintiff is a citizen of New York and defendants are citizens of a foreign state. Accordingly, there is complete diversity between plaintiff and defendants and the matter in controversy, exclusive of interest and costs, exceeds $75,000.

8. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391 (a) and (d). Venue is also proper in the Southern District of New York pursuant to the written agreement between the parties that provides that all actions related to that agreement shall be brought in New York County, New York (Agreement, dated May 7, 1999 ¶ 14(b) entitled "Miscellaneous").

## FACTS COMMON TO ALL CLAIMS

9. At all times relevant herein, Miramax has been in the business of, among other things, producing and distributing motion pictures, including numerous Oscar-winning and Oscar-nominated films.

10. Upon information and belief, at all times relevant herein, defendants have been and still are in the business of producing and distributing motion pictures and television programs worldwide.

11. Pursuant to the terms of the May 7, 1999 Agreement, executed by Miramax, on the one hand, and Granada and LWT on the other hand, and as amended by the parties' agreement on April 11, 2000, November 8, 2000, August 30, 2001, October 3, 2001, October 29, 2001, November 30, 2001, December 6, 2001, December 10, 2001, August 9, 2002, August 10, 2002, and November 6, 2002 (the "Agreement"), defendants granted to Miramax an exclusive and irrevocable option (the "Option") to finance, co-produce, and to acquire all of the worldwide distribution and exploitation rights in all media for the Picture then existing or thereafter known (the "Rights"), subject only to Granada's right to acquire certain distribution rights to the Picture in the United Kingdom of Great Britain and North Ireland, the Republic of Ireland, the Channel Islands and the Isle of Man.

12. In consideration for the Option grant, and subject to defendants' obligations as set forth in the Agreement, including defendants' obligations to (i) repay Miramax's development costs, (ii) re-submit the Picture to Miramax in the event that Miramax did not exercise the Option but defendants proceeded to produce the Picture at some later time, and (iii) offer Miramax a right of first negotiation and first refusal for the North American distribution rights, Miramax agreed to finance all development costs of the Picture as of the execution date of the Agreement.

13. Subsequent to the execution of the Agreement, and in accordance with its obligations under paragraph 2 therein, from in or about May, 1999 through November, 2002, Miramax expended substantial financial and other resources to develop the Picture (the "Development Costs"). For example, Miramax commissioned at least three (3) re-writes of the October 1998 Andrew Davies screenplay at a cost of approximately $135,000. After substantial negotiations, Miramax also engaged the services of a well-known actress to play the leading female role in the Picture at a cost of approximately $350,000. Miramax also expended in excess of $60,000 in other development costs for the Picture, including for business meetings and travel, directorial development assistance and for other usual and customary industry development expenses. Pursuant to the terms of the parties' Agreement, Miramax also paid to defendants $37,645.16 for certain development costs they had incurred prior to the execution of the Agreement. In addition to financing the Picture's development, for almost three (3) years Miramax devoted substantial creative effort in developing the Picture. Miramax's verifiable out-of-pocket Development Costs with respect to the Picture total $649,867.34, all of which Miramax is entitled to recover from defendants plus interest

at the rate of 2% over the United States prime rate used by the Bank of America, as provided for in the Agreement.

14. Pursuant to the express terms of the Agreement, defendants were obligated to repay to Miramax all of its Development Costs if, among other events, Miramax did not exercise the Option as alleged herein. The Agreement expressly provided that defendants were required to repay Miramax for its Development Costs, plus interest as agreed, upon the earlier of (i) defendants "entering into a binding agreement with a major US studio or mini studio to set up the Picture as a theatrical motion picture; or (ii) if the Picture is not set up as a theatrical motion picture or if the Picture is set up as theatrical motion picture but without a major US studio or mini studio as the principal financier, upon the first day of principal photography." (Agreement paragraph 2(b)).

15. Pursuant to the terms of the Agreement, while the Option was still exercisable, on November 15, 2002, Miramax gave defendants written notice that it was not exercising the Option to co-produce with defendants, finance and distribute the Picture. In its November 15, 2002 notice letter, Miramax confirmed that defendants' stated lack of interest in producing or co-producing the Picture as originally provided for in the Agreement was a significant contributing factor in Miramax's decision to let the Option lapse.

16. In that November 15, 2002 letter, Miramax also confirmed defendants' obligation, pursuant to paragraph 2(c) of the Agreement, to re-submit the Picture to Miramax in the event that defendants decided to produce the Picture at some later date. Pursuant to paragraph 2 (c) of the Agreement, if the Picture was abandoned or deemed abandoned pursuant to paragraph 2(b) and if the Picture had new or changed elements,

defendants were required to re-submit the Picture to Miramax for a first right of election to finance and distribute the Picture before they were permitted to solicit or enter into a new binding agreement with respect to its production, financing or distribution.

17. Changed Elements was defined in the Agreement as a material change in the script or storyline or a material re-write of the script, a changed or additional material creative element, *e.g.* a writer, director or principal actor, a material change in favor of defendants in terms of any such person's attachment to the Picture, any change of ten percent (10%) or more (in either direction) in budget or any change of any other business or financial terms less favorable to defendants than those contained in the Agreement or than those last presented to Miramax. (Agreement ¶ 2(c)).

18. The Agreement also provided Miramax with a right of first negotiation and first refusal for all of the North American distribution rights of whatever nature and term in the event that Miramax did not exercise the Option and defendants later produced the Picture as a UK TV Production.

19. A UK TV Production was defined in the Agreement as "any television film, television series or television mini-series budgeted at £2.5million or less which is intended initially and primarily for exhibition on UK television and which does not make use of all or any part of any versions(s) of the Screenplay commissioned after the date of th[e] [a]greement and paid for by Miramax either directly or via the Producer (as defined in paragraph 3(a)" of the Agreement.

20. Pursuant to the terms and conditions of the Agreement, defendants were prohibited from offering the North American distribution rights for any such UK TV

Production of the Picture to any third party unless and until defendants granted Miramax an exclusive twenty (20) business day right of first negotiation and first refusal to acquire such North American distribution rights in perpetuity. The Agreement provided a specific procedure with respect to that right of first negotiation and first refusal and provided that Miramax has an exclusive twenty (20) business day right of first negotiation/first refusal at then applicable market rates as the same may be negotiated in good faith. The Agreement further provided that if the parties has not reached agreement at the end of that twenty (20) day period, defendants were required to submit to Miramax "a written summary of the best terms, (i.e. the terms most favorable to Miramax) upon which the Company [defendants] would be willing to sell the North American Rights to Miramax" at which point Miramax had an additional three (3) days to elect to acquire the North American Distribution Rights. The Agreement expressly prohibited defendants from entering "into any agreement with a third party for the sale or license of the North American Rights on terms less favorable to the Company then the best terms offered to Miramax" unless Miramax was given ten (10) days written notice to match those terms.

Defendants' Wrongful Conduct

21.   Upon information and belief, commencing in or about July, 2006, defendants proceeded to produce, distribute and release the Picture in violation of Miramax's rights and in breach of their obligations under the Agreement. Upon information and belief, and as reported on www.IMDB.com, a reputable entertainment industry website, defendants, together with a third party, produced, distributed and released the Picture on various television stations worldwide, including in the United States, beginning in March,

2007. Upon information and belief, the Picture, as produced, distributed and released by defendants in violation of the terms of the Agreement had numerous Changed Elements, including, among other things, a new producer, new director and principal actor, and a ten percent (10%) change in the Picture's budget, all of which would have required prior resubmission to Miramax under paragraph 2(c) of the Agreement.

22. Prior to producing the Picture with Changed Elements, defendants failed, as required by the Agreement, to re-submit the Picture with Changed Elements to Miramax for Miramax's right of election to finance and distribute the Picture on the terms set forth in the Agreement.

23. Defendants also failed to repay to Miramax its Development Costs upon the earlier of the Defendants' either having contracted with a major US studio or mini studio with respect to the Picture or defendants having commenced principal photography of the Picture.

24. Alternatively, and only the extent that the Picture was produced as a UK TV Production --and, upon information and belief it was not because (a) the budget was more than £2.5 million, (b) it was not intended initially and primarily for exhibition on United Kingdom television in that it was exhibited worldwide, on television including in the United States; and (c) it made use of all or part of the screenplays commissioned and paid for by Miramax--defendants failed to grant Miramax its right of first negotiation and first refusal with respect to the North American distribution rights for any such UK TV Production, as they were expressly required to do by the Agreement.

25. During the period June 3, 2008 through September 16, 2008, Miramax sent defendants repeated letters demanding that defendants comply with their contractual obligations by, among other things, repaying to Miramax its Developments Costs in the amount of $1,018,789, plus additional accruing interest at the rate of $124.63 per day.

26. Notwithstanding repeated and due demand, defendants have failed to repay to Miramax the Development Costs, plus interest as agreed, as expressly required by the Agreement.

## AS AND FOR A FIRST CLAIM FOR RELIEF
(Breach of Contract)

27. Miramax repeats and realleges each and every allegation set forth in paragraphs 1 through 26 of this Complaint with the same force and effect as if fully set forth herein.

28. From the inception of the parties' relationship, Miramax fully complied with its obligations under the Agreement by, among other things, developing the Picture and paying all of the Development Costs in connection therewith.

29. Defendants failed to comply with their obligations under the Agreement by failing to re-submit the Picture with Changed Elements to Miramax after the Option expired thereby depriving Miramax of its contractually agreed to right to elect to finance and distribute the Picture in accordance with the terms of the Agreement.

30. Defendants also failed to repay to Miramax the Development Costs, plus interest as agreed, as required by the express terms of the Agreement, notwithstanding Miramax's repeated and due demands that defendants do so.

31. By reason of the foregoing, defendants have breached their contract with Miramax, and Miramax has been damaged by defendants conduct in an amount to be determined at trial, but believed to be no less than $2,000,000.

### AS AND FOR A SECOND CLAIM FOR RELIEF
(In the alternative, Breach of Contract)

32. Miramax repeats and realleges each and every allegation set forth in paragraphs 1 through 31 of this Complaint with the same force and effect as if fully set forth herein.

33. In the event that it is established that the Picture was produced as a UK TV Production as that term is expressly defined in the Agreement, defendants distributed and released the Picture in the United States and elsewhere without complying with its express contractual obligation to offer Miramax its right of first negotiation and first refusal for the North American Distribution rights in perpetuity for any such UK TV Production.

34. By reason of the foregoing, defendants alternatively breached their contract with Miramax and Miramax has been damaged by defendants' conduct in an amount to be determined at trial, but believed to be no less than a $1,000,000.

### AS AND FOR A THIRD CLAIM FOR RELIEF
(Unjust Enrichment)

35. Miramax repeats and realleges each and every allegation set forth in paragraphs 1 through 34 of this Complaint with the same force and effect as if fully set forth herein.

36. Miramax's payment of over $600,000 in Developments Costs for the Picture, which included commissioning numerous re-writes of the screenplay (copies of which screenplays were provided to defendants), without defendants having re-submitted the Picture with Changed Elements to Miramax or having offered Miramax a first negotiation and first refusal for the North American distribution rights for any UK TV Production of the Picture conferred a substantial benefit on defendants.

37. Defendants accepted, retained and used Miramax's development efforts with respect to the Picture, including, upon information and belief, the screenplays that Miramax commissioned and paid for, and have been enriched by receiving the benefit of Miramax's development efforts and expenditure of over $600,000 in Development Costs.

38. Defendants' acceptance and retention of the benefit conferred upon them renders it inequitable for defendants to retain the revenues from the distribution of the Picture without repaying Miramax its Development Costs, plus interest.

39. By reason of the foregoing, it is against equity and good conscience to permit defendants to retain the revenues from the distribution of the Picture without having repaid Miramax its Development Costs. Accordingly, based on the doctrine of unjust enrichment, Miramax is entitled to restitution of its Development Costs in amount of $649,867.91, plus interest.

WHEREFORE, plaintiff Miramax demands judgment in its favor and against defendants as follows:

A. On the First Claim for Relief, granting an award of damages in an amount to be determined at trial, but believed to be not less than $2,000,000.

B.  On the alternative Second Claim for Relief, granting to Miramax award of damages in an amount to be determined at trial, but believed to be not less than $1,000,000.

C.  On the Third Claim for Relief, ordering that defendants repay Miramax all of its Development Costs in the amount of $649,867.91, plus interest.

D.  On each Claim for Relief, awarding interest and plaintiff's costs, disbursements and attorneys' fees as allowed by law; and

E.  Such other and further relief as the Court deems just and proper.

<u>PLAINTIFF DEMANDS A TRIAL BY JURY</u>

Dated: New York, New York
       April 14, 2009

SCHWARTZ & THOMASHOWER LLP

By: _____
Rachel Schwartz
William Thomashower
115 Broadway, Suite 1505
New York, New York 10006
(212) 227-4300

Attorneys for Plaintiff Miramax Film Corp.